IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 18-CR-00328-PAB

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

MICHAEL BENITEZ-LOPEZ,

        Defendant.
_____

REPORTER'S TRANSCRIPT
Sentencing
_____

        Proceedings before the HONORABLE PHILIP A. BRIMMER,
Chief Judge, United States District Court for the District of
Colorado, commencing at 11:15 a.m., on the 1st day of November,
2019, in Courtroom A701, United States Courthouse, Denver,
Colorado.

APPEARANCES

        Stephanie P. Podolak and Zachary H. Phillips,
U.S. Attorney's Office, 1801 California Street, Suite 1600,
Denver, CO 80202, appearing for the plaintiff.

        Richard N. Stuckey, Attorney at Law, P.C.
1801 Broadway, Suite 1400, Denver, CO 80202-3839 appearing for
the defendant.


Proceeding Recorded by Mechanical Stenography, Transcription
Produced via Computer by Janet M. Coppock, 901 19th Street,
Room A257, Denver, Colorado, 80294, (303) 335-2106

1        PROCEEDINGS

2        *THE COURT:*  The matter before the Court is United

3   States of America v. Defendant No. 6, Michael Benitez-Lopez.

4   This is Criminal Case 18-CR-328.

5        Ms. Podolak and Mr. Phillips appear on behalf of the

6   United States.  Good morning to you.

7        *MS. PODOLAK:*  Good morning.

8        *MR. PHILLIPS:*  Good morning, Your Honor.

9        *THE COURT:*  Mr. Stuckey is here on behalf of

10  Mr. Benitez-Lopez.  Mr. Benitez-Lopez is here.  He is in

11  custody.  Mr. Thoene is here as well as part of the defense

12  team as an investigator.

13       *MR. STUCKEY:*  Good morning, Your Honor.

14       *THE COURT:*  Good morning to each of you as well.

15       We are here today for sentencing in this matter.

16       Mr. Stuckey, have you had a chance to review the

17  Presentence Investigation Report and the addendum with

18  Mr. Benitez-Lopez?

19       *MR. STUCKEY:*  We have, Your Honor.

20       *THE COURT:*  You have filed on his behalf a sentencing

21  statement, which is Docket No. 339, objections to the

22  Presentence Investigation Report, which is Docket No. 369, a

23  motion for downward departure, which is Docket No. 395, and

24  also a motion for a variant sentence, which is Docket No. 396.

25       Any additional objections or any additional motions on

1  behalf of Mr. Benitez-Lopez?

2       *MR. STUCKEY:*  No, sir.  We will be requesting a local

3  place of confinement in an RDAP program, but I don't believe

4  those are in the form of motions.  Thank you.

5       *THE COURT:*  Thank you, Mr. Stuckey.

6       Ms. Podolak, has the United States had an opportunity

7  to review the Presentence Investigation Report and the

8  addendum?

9       *MS. PODOLAK:*  Yes, Your Honor.

10      *THE COURT:*  And the United States has filed a response

11  to the -- well, actually, I will start chronologically.  The

12  United States filed a sentencing statement, which is Docket No.

13  324, and also filed a response to the defendant's motion for a

14  downward departure and also to the motion for a variant

15  sentence.  That is Docket No. 418.

16      Any objections on behalf of the United States or any

17  additional filings on behalf of the United States?

18      *MS. PODOLAK:*  No, Your Honor.

19      *THE COURT:*  Thank you.

20      Then why don't we take up, first of all, the

21  objections to the Presentence Report.  That's Docket No. 369.

22      Mr. Stuckey, go ahead.

23      *MR. STUCKEY:*  It's pretty much stated in there, Your

24  Honor, what our objections are.  There are actually three.  The

25  two main ones are to the amount of drugs involved, of course,

1    as we have argued and stated.  The second is to the adjustment

2    for obstruction of justice.  And we sort of made an objection,

3    although we just noted that we would be asking for a downward

4    departure from Criminal History Category IV to III.  So it's

5    really the two main objections.

6         The first one is, as we set out, on Page 3 of our

7    response or objections to the PSIR, really only about 6.35 or

8    less than 7 kilograms.  This 50 to 150-kilogram business we

9    just don't think is in any way -- has in any way been shown by

10   the government either at trial or whatever as to

11   Mr. Benitez-Lopez, so we argue that the appropriate guideline

12   level would be 30.

13        *THE COURT:*  Why don't we take that one up now unless

14   you have anything more on --

15        *MR. STUCKEY:*  No, we've said it.  It's what we said in

16   our argument and I don't need to repeat that.  I know the Court

17   has looked at it.

18        *THE COURT:*  Sure.

19        Ms. Podolak?

20        *MS. PODOLAK:*  The Court heard the evidence at trial.

21   And, of course, the question is not what did Mr. Benitez-Lopez

22   actually do, but what was reasonably foreseeable to him.  I

23   believe the main witness, Omar Chavez-Gutierrez, was asked at

24   one point by Mr. Stuckey on cross-examination:  So it's true

25   that you sold 240 kilos.

1          And his response was:  It might have been more.

2          The question is did the defendant know that.  And if

3   you look at the calls where they talk about four, four, four

4   and four, I want to start doing that every week, there is one

5   conversation about 14 kilos are coming and everybody should

6   calm down.  This doesn't even take into account the drugs that

7   were part of the Talamantes case where there was an actual

8   seizure of 1 or 2 kilograms from the defendant in a series of

9   events that ended up with that seizure.  So if you look at all

10  of that together, the 50 to 150 is easily reasonably

11  foreseeable.

12          *THE COURT:*  Well, I am not quite sure.  I mean, so

13  first of all, if you added up just the kilos that the defendant

14  referred to, not necessarily ones that he purchased or dealt or

15  anything like that, what number do you get then?  We are

16  talking about, four, four, four, that type of thing.

17          *MS. PODOLAK:*  Well, he was talking about four, four

18  and four every week.  That's what he said he wanted to do.  And

19  the question is, what was the response?  The response from Omar

20  Chavez was, okay, we can do that.  So if you did four times the

21  number of weeks in the year, you're well over the 150, assuming

22  he was able to do that.

23          And then you have the conversations where he got two

24  cars and then another two cars.  And then there was the

25  14 kilos that were coming with Mr. Gamez and the combination

1    with the other couriers from the other source of supply.  And

2    he knows these couriers are coming because Omar tells him that,

3    tells him he is going to meet with them out at the barn where

4    some of the drugs were off-loaded.  So the question is would he

5    have had reason to believe that Omar could supply more than

6    150 kilograms.  And certainly he could just based on the four,

7    four, four and four a week is what I want to do.

8         THE COURT:  And the government's position is that what

9    was reasonably foreseeable to him was between 50 and 150?

10        MS. PODOLAK:  I believe that's correct, Your Honor,

11   base offense level 34.

12        THE COURT:  Okay. anything else on that topic,

13   Ms. Podolak?

14        MS. PODOLAK:  No, Your Honor.

15        THE COURT:  Mr. Stuckey, anything more on the offense

16   level based on what was reasonably foreseeable to your client?

17        MR. STUCKEY:  I suppose, Your Honor, the key is

18   reasonably foreseeable.  It's a lot of speculation what

19   Ms. Podolak has posed.  There is a long period of time when the

20   defendant didn't have any contact with Omar, so he really

21   didn't have any idea what the extent of Mr. Omar

22   Chavez-Gutierrez's shipments were or involvement was or how

23   much he had.  It's just pure speculation, it would have been on

24   his part, so I would say it's not reasonably foreseeable that

25   he would have known 50 to 150.

1          Thank you.

2          *THE COURT:*  Thank you, Mr. Stuckey.

3          I think that there is a question or at least it boils

4     down to what was reasonably foreseeable to Mr. Benitez-Lopez.

5     As Ms. Podolak mentioned, there were those conversations where

6     the defendant was exposed to statements by Mr. Chavez-Gutierrez

7     about amounts where the defendant, Mr. Benitez-Lopez, was

8     asking about amounts.  Mr. Stuckey is quite correct that the

9     actual amount in issue in terms of him purchasing was under

10    7 kilos or about 7 kilos.

11         But in terms of reasonable foreseeability, certainly

12    the conversations that Mr. Benitez-Lopez was having with

13    Mr. Chavez-Gutierrez indicated that Mr. Benitez-Lopez thought

14    that Mr. Chavez-Gutierrez was good for a lot of cocaine.  You

15    know, the four, four, four, all of those things, these were

16    things that Mr. Chavez-Gutierrez couldn't necessarily guarantee

17    would come in on time, but Mr. Benitez-Lopez certainly thought

18    that he had the ability to access that.

19         I am going to overrule the objection.  I think that it

20    is certainly reasonably foreseeable and was reasonably

21    foreseeable to Mr. Benitez-Lopez that the conspiracy that he

22    was involved in involved at least 50 kilograms of cocaine.  So

23    I believe that the offense level in the Presentence

24    Investigation Report for that amount is correctly calculated as

25    34.

1        Mr. Stuckey, the next objection, then?  Why don't we

2    take that one up.  This is the obstruction of justice.

3        MR. STUCKEY:  Yes, sir, Your Honor.  On Page 4 we

4    address that in our response to the PSIR.  And the main point

5    that we make and we feel is controlling is that somehow the act

6    which is considered for obstruction of justice has to

7    significantly obstruct or impede the prosecution.  This

8    business of this letter that he wrote essentially giving his

9    mother legal advice in no way, shape or form impeded or had any

10   impact whatsoever on the prosecution of the case or the

11   investigation for that matter.

12       THE COURT:  What if you had a situation like in the

13   *Fleming* case where the issue is not an act of obstruction, but

14   an attempt to obstruct?  Any case law that would support the

15   notion that you need to demonstrate some material effect on the

16   government's prosecution where the allegation is an attempt to

17   obstruct?

18       MR. STUCKEY:  I think the case law indicates there has

19   to be a substantial step forward to, in terms of a witness,

20   threaten or intimidate a witness.

21       THE COURT:  And what was the evidence regarding

22   Mr. Benitez-Lopez's letter, which is dated July 10th of 2019?

23   I can't quite remember, but was the evidence that he had placed

24   it in essentially the prison or the jail mail postmarked to his

25   girlfriend?

1            *MR. STUCKEY:*  Correct.

2            *THE COURT:*  Okay.  Why wouldn't that be a substantial

3    step if --

4            *MR. STUCKEY:*  Well, that's fairly innocuous.  I mean,

5    the gist of their complaint was what was stated in the letter.

6    I mean, it didn't go anyplace.  The deputy sheriff intercepted

7    it, but I would say that's not a substantial step.  A

8    substantial step would have to be for him to coordinate or

9    communicate with someone on the outside of the prison, to go

10   and have a conversation with a witness and say, here, don't do

11   this.  Don't show up, don't whatever, to either threaten or

12   intimidate them.

13           And then, of course, as we've argued, saying to his

14   mother, "Don't say anything, take the Fifth" or "get a lawyer,"

15   I forget how it was worded, but that doesn't intimidate or

16   threaten her in any way.  I might add that for that matter she

17   was subpoenaed by the government and she showed up pursuant to

18   that subpoena.  And the government interviewed her during the

19   course of the trial in one of the interview rooms behind us and

20   decided not to call her.  They could have.  I mean, at least

21   she showed up for the subpoena to indicate I would say no

22   intimidation or certainly no threat.  We just don't feel that

23   it rises at all to the level of obstruction.

24           *THE COURT:*  Anything else on that, Mr. Stuckey?

25           *MR. STUCKEY:*  That's all I have, Your Honor.

1          *THE COURT:*  Ms. Podolak?

2          *MS. PODOLAK:*  Your Honor, the question is what was the

3    defendant's intent when he sent that letter.  And it's

4    interesting to note the letter started with, "Talk to my

5    mother," and then ended with, "Don't forget to talk to my

6    mother."  And the instruction and the context of that

7    conversation were there are calls with her involving drug

8    trafficking or putting her into the drug trafficking activity.

9    "Tell her not to say anything."  What he actually said was

10   "Play the Fifth," if she is called to testify.  And he said it

11   twice.

12         *THE COURT:*  Well, I don't know how much weight you can

13   put on "plays the Fifth."  His command of English isn't too

14   good throughout the letter.

15         *MS. PODOLAK:*  But that's the word that he used.  He

16   wanted her to plead the Fifth.  And he started with that and

17   then ended with the instruction to his girlfriend, be sure and

18   tell her this.  So he had a reason for doing this, and it's

19   because he didn't want her to say anything.  If the police were

20   to come and subpoena her and try to interview her, he wanted

21   her to stay quiet and not say anything which was going to

22   implicate him, which it would have.

23         And when we did interview her and even confronted with

24   the conversation, she is like, I don't know anything.  So I

25   think it actually had the effect of impeding a witness, and

1    that was why we decided not to call her.  So with the intent

2    and the step of actually sending the letter, I mean, he had no

3    way of knowing it was going to be intercepted.

4         THE COURT:  And can you refresh my memory on what you

5    believe the facts were concerning the attempt to send the

6    letter?

7         MS. PODOLAK:  He placed it into the prison system

8    addressed to his girlfriend with his name on the top.  And then

9    there were also references --

10        THE COURT:  I do have -- it was Exhibit 84.  I do have

11   that, right.

12        MS. PODOLAK:  And there were references in there to

13   "my son" and other things, so it was clearly coming from him.

14   And then it went into the prison mail.  And we got lucky that

15   somebody was paying attention that day and doing their job and

16   they saw this, communicated with us and said, you know, what do

17   you think?

18        THE COURT:  Was the letter copied, but nevertheless

19   forwarded on?

20        MS. PODOLAK:  It was not forwarded on.

21        THE COURT:  It was intercepted.

22        MS. PODOLAK:  It was intercepted.

23        THE COURT:  Anything more, Ms. Podolak?

24        MS. PODOLAK:  No, thank you.

25        THE COURT:  Mr. Stuckey, anything more on this point?

1        *MR. STUCKEY:*  Just to state, Your Honor, that if we

2   are at a point where telling a witness they can take the Fifth

3   is obstruction of justice, that's going to be news to a lot of

4   attorneys.  I just don't think that the nature of it -- if, in

5   fact, the letter had said, not probable because it was about

6   his mother, but if it was to another witness in the letter and

7   it said, "If you testify, I am going to have Joe Schmo and two

8   others come beat you up," well, that would be different.  But

9   just to say, and I think he said "My attorney said you don't

10  have to say anything, you can take the Fifth," that can't be

11  obstruction.

12        Thank you.

13        *THE COURT:*  Okay.  So the issue before the Court is

14  Mr. Benitez-Lopez's objection to Paragraph 52 of the

15  Presentence Investigation Report wherein the Probation

16  Department adds two points to his offense level for obstruction

17  of justice.  The enhancement which is under Guideline Section

18  C -- excuse me, 3C1.1 is based upon a letter which was admitted

19  at the trial as Government Exhibit 84.

20        As Ms. Podolak mentioned, the letter really has two

21  references that are pertinent to the issue of obstruction.  The

22  first is the very beginning portion of the letter.  Let me read

23  that.  "Babe, so today my lawyer said that they might subpoena

24  my mom to go to court to testify against me.  But tell her if

25  they do to just say she don't know shit.  She plays the 5th,"

1    and then it goes on.  And then towards the bottom, not at the

2    very end, but towards the bottom of the letter there is another

3    statement that says, "Tell my mom asap what I said K!"

4           First of all, in terms of Mr. Stuckey's argument, the

5    letter doesn't say that the lawyer is suggesting anything about

6    the Fifth.  Instead, it says the lawyer had simply informed

7    Mr. Benitez-Lopez that they, meaning the government, might

8    subpoena his mother to go to court and testify against him.

9           And then the letter says, "But tell her if they do to

10   just say she don't know shit."  And then it says, "She plays

11   the 5th."  If it had only said, "Tell her she should plead the

12   Fifth," I think it would be a completely different situation

13   because there is evidence that the mother was involved, and

14   therefore she might very well have a Fifth Amendment right, but

15   that's not what the first part of that sentence says; instead,

16   "Just say she don't know shit."

17          So in other words, it wasn't just invoking her right

18   to plead the Fifth Amendment.  Why?  Because she really does

19   know a lot and what she knows might incriminate her, but

20   instead she should tell them, so this is totally contrary to

21   the Fifth Amendment, she should tell them that she doesn't know

22   anything.  That is for a witness, and of course the defendant

23   understood that she might be a witness against him, that was

24   the purpose of the subpoena, that the instruction was to have

25   her mother say something untruthful to the government, namely,

1   that she didn't know anything.

2          That's obstruction.  There is no doubt about it.  And

3   it's not obstruction, but rather I should say an attempt to

4   obstruct.  It turns out it didn't happen, but certainly when

5   you send a letter in the United States mail, you would expect

6   that it would get delivered, of course, maybe if you're a

7   prisoner at the time, but in any event, that was

8   Mr. Benitez-Lopez's hope that it would get through.  There is

9   no indication that he didn't have any other anticipation other

10  than that letter would get through and the word would go from

11  his girlfriend to his mother and his mother, as a result, would

12  claim that she didn't know anything.

13         So really the *Fleming* case, and that's United States

14  v. *Fleming*, 667 F.3d 1098, is really quite helpful on the point

15  not only with attempt, but also in terms of what obstruction

16  would actually be.  And it mentions the fact that obstruction

17  could be of a witness or the attempt to influence the witness'

18  testimony.  It does indicate, as Mr. Stuckey said, that in

19  order for the government to prove the enhancement for

20  obstruction, the government must demonstrate that the defendant

21  intended to obstruct justice, and two, committed an act that

22  constitutes a substantial step towards the obstruction of

23  justice.

24         First, I think that the letter in and of itself

25  clearly indicates an intent to obstruct justice, namely causing

1  a witness who was being subpoenaed by the United States to

2  testify against him to claim that she didn't know anything.

3  And second, his act of placing -- of writing that letter, of

4  placing that letter in an envelope and placing that letter in

5  an envelope addressed to his girlfriend and in placing a stamp

6  on that envelope and then finally placing that stamp into the

7  prison mail system were substantial steps in the commission of

8  the attempted obstruction of justice.

9       So I'll overrule that objection.  I find that

10 Paragraph 52 appropriately enhances the offense level by two.

11      Mr. Stuckey, do you want to take up now your motion

12 for a downward departure based upon over-representation of

13 criminal history category?

14      *MR. STUCKEY:*  Yes, sir.

15      *THE COURT:*  That's Docket No. 395.  Go ahead.

16      *MR. STUCKEY:*  Our main point, Your Honor, as stated in

17 there is that Criminal History Category IV technically reached

18 by his record, which is usually indicative of an individual

19 amassing numerous several misdemeanor and felony convictions,

20 should not apply to an individual defendant who has -- whose

21 criminal history points are based on traffic, granted it's

22 DUIs, driving under the influence, and one misdemeanor

23 conviction.

24      Granted, he has juvenile convictions, but they don't

25 count in assessing points and for good reason.  The Sentencing

1    Commission has decided after a period of time to let those go.

2    And the probation officer has correctly indicated after some

3    searching and diligence on her part, found out that they could

4    not substantiate the defendant being incarcerated anytime

5    during the five-year throw-back backwards whatever, five-year

6    back period.  But there is one DUI, all right, and then there

7    is the second DUI.  But he is on probation for that, so that

8    second DUI gets him four points.  And the obstruction was when

9    he was, what, 19 years old, and he is here today 27, 28?  Was

10   your birthday yesterday?

11           THE DEFENDANT:  27.

12           MR. STUCKEY:  27 years old, seven, eight, nine years

13   ago.  And that obviously resulted as the facts show in the PSIR

14   from being intoxicated and having difficulty with a police

15   officer.  Granted, it's not great, but it's not four.  That's

16   our argument.  And I don't know, what we should have probably

17   argued is it should be down to a Criminal History Category II,

18   two DUIs and a misdemeanor.  That's what we said in the motion

19   and that's what we would repeat today.

20           Thank you, Your Honor.

21           THE COURT:  Thank you, Mr. Stuckey.

22           Ms. Podolak?

23           MS. PODOLAK:  Your Honor, as I said in my response, I

24   think there is actually a very good argument that the criminal

25   history category underrepresents this defendant's past because

1    if you go back and look at all of the prior narcotics

2    convictions which didn't count, they are all in furtherance and

3    leading up to the activity which he was charged with and was

4    tried for and convicted.

5         But only looking at the adult criminal convictions,

6    the two points for obstructing a police officer or peace

7    officer are very informative because it's not just obstructing,

8    but what he did was threaten a police officer and the officer's

9    family, sort of a recurring pattern we have here with

10   threatening police officers or threatening witnesses or trying

11   to obstruct justice.

12        The other pieces, the other points culminate because

13   he is on probation, on parole, and he cannot abide by the rules

14   that were set for him.  And he kept going back in and back in

15   and back in.  If he had behaved himself while he was out of

16   custody, none of these things would have counted, but they do

17   count because they run into the current activity.  The

18   government believes that the probation officer correctly

19   calculated the amount and that the criminal history category is

20   actually reflective of who this defendant is.

21        *THE COURT:*  All right.  Thank you, Ms. Podolak.

22        Mr. Stuckey, anything more from you on the motion for

23   downward departure?

24        *MR. STUCKEY:*  No, sir.

25        *THE COURT:*  Okay.  So what's before the Court now is

1   the motion for downward departure.  This is a motion pursuant

2   to Guideline Section 4A1.3(b)(1), Docket No. 395.  And the

3   argument is that the Probation Department's calculation of

4   Criminal History Category IV for Mr. Benitez-Lopez, which by

5   the way neither side believes is incorrectly calculated,

6   significantly overrepresents the seriousness of his criminal

7   history and that a downward departure would be appropriate.

8           Mr. Stuckey would like the Court to sentence him as if

9   he were in Criminal History Category III, although he says that

10  maybe there could be a strong argument for Criminal History

11  Category II.  And the basis for the argument as Mr. Stuckey

12  just indicated is that those convictions for which

13  Mr. Benitez-Lopez gets criminal history category points are all

14  misdemeanor offenses, traffic offenses.  And one would expect

15  or at least Criminal History Category IV would typically be

16  comprised of at least some type of felony convictions, which is

17  not true as for Mr. Benitez-Lopez.

18          When you look over Mr. Benitez-Lopez's criminal

19  history, you know, it is of course true as Mr. Stuckey said, he

20  doesn't get any points for any of his juvenile adjudications.

21  On the other hand, it's appropriate on a motion like this to

22  look at his juvenile history.  And when you do, you see that

23  Mr. Benitez-Lopez at age 16 got a juvenile adjudication for

24  distribution of a Schedule II controlled substance and also

25  conspiracy to distribute a Schedule II controlled substance.

1    He also had a number of different driving offenses,

2  pretty minor really.  But then Paragraph 60, he has another

3  adjudication for attempted distribution of a Schedule II

4  controlled substance which had he been an adult would have been

5  a felony offense.  And then Paragraph 61, second-degree

6  burglary of a building, once again, that would have been a

7  felony had he been convicted as an adult.

8    The other thing that is important to look at in

9  talking about his adult criminal history are two things.

10  No. 1, not only does Mr. Benitez-Lopez just chronically pick up

11  convictions, but the reason he gets points is because of how

12  bad his criminal history was at the time of sentencing or

13  because he failed to comply with the terms and conditions of

14  the original sentence.  And, you know, understandably when you

15  do that, your criminal history goes up.

16    So rather than his Criminal History Category of IV

17  overrepresenting his criminal history, I agree with

18  Ms. Podolak, if anything, there is a really good argument that

19  he should have been in a higher criminal history category

20  because of those drug dealing adjudications when he was a

21  juvenile.  When you combine that with the fact that he is

22  before the Court on a distribution conviction, it puts things

23  in perspective.  Criminal History Category IV I think correctly

24  reflects the seriousness of his criminal history, so I will

25  deny that motion for a downward departure.

1          What that then means is that the defendant's total

2     offense level would be 36, his Criminal History Category of IV,

3     and that results in an imprisonment range of between 262 months

4     and 327 months imprisonment, a fine range between 40,000 and

5     $10 million, and a supervised release range at the top of five

6     years, that being Count One.

7          Then, Mr. Stuckey, would you like to argue your motion

8     for a variant sentence separately or would you like to combine

9     that with your overall recommendation of a sentence in this

10    case?

11          *MR. STUCKEY:*  Combined, Your Honor.

12          *THE COURT:*  Okay.

13          Ms. Podolak, any objection to him doing so?

14          *MS. PODOLAK:*  No, Your Honor.

15          *THE COURT:*  I will hear from Mr. Stuckey first.  After

16    that I will hear from Ms. Podolak.  And finally, I will give

17    Mr. Benitez-Lopez an opportunity to address the Court.

18          Mr. Stuckey, go ahead.

19          *MR. STUCKEY:*  Thank you, Your Honor.

20          The first thing that stands out in my mind is that as

21    an anomaly here Omar Chavez-Gutierrez who testified and clearly

22    everyone knew and conceded that he was the big man and the big

23    operator.  As a matter of fact, in his Plea Agreement he gets

24    an increase for possession of weapons, something that Michael

25    didn't have, and he gets an increase for three levels for role

1    in the offense and he comes out quite high.

2            Nevertheless, the government recommendation in that

3    Plea Agreement is for 136 months, just slightly over 11 years.

4    262, the government's recommendation in this case, is twice

5    that.  It's 22 and -- nearly a few months shy of 22 years.

6    What would Michael Benitez be facing a sentence of some 22

7    years when Omar, the man that ran the show, the main drug

8    importer from Mexico who had all the other buyers and all that,

9    gets half that sentence?

10           THE COURT:  Well, I mean, you know, there is no doubt

11   that Mr. Benitez-Lopez could be Exhibit 1 for what not to do

12   when facing with lots of evidence against you and recordings

13   and, you know, a co-defendant who has already indicated that he

14   is cooperating.  I mean, the question is how much of a discount

15   do you get for just being stupid?

16           MR. STUCKEY:  Well, we didn't put on any evidence.  He

17   didn't testify.  He came as close to a non-pleading defendant

18   to getting acceptance of responsibility in my mind as you can

19   get except that it doesn't qualify unless your going to trial

20   is for the purpose of preserving a constitutional issue or some

21   stuff.  But it's not as if he fabricated a defense or

22   subpoenaed witnesses or got witnesses that were not going to be

23   truthful or anything.  We just sat and listened and put

24   government to its proof.  Granted, as Your Honor has indicated,

25   there was plenty of it.

1       But still at the end of the day, this disparity

2  between what Omar, the testifying defendant, leader of the

3  gang, is going to get as a sentence probably and what the

4  government's asking for here just calls out for the need for

5  the Court, and we pray for this, that the Court grant the

6  motion for a variant sentence.

7       As the Court well knows, and I think I said that in

8  our motion, as the Court has well and often recognized, the

9  Court under the sentencing statute 18 U.S.C. 3553 must impose a

10  sentence sufficient, but not greater than necessary, to comply

11  with all of the purposes of the sentencing statute.  And we

12  hear these words a lot and they are used a lot, but here they

13  are very significant.  Sufficient is 120 months, 10 years, the

14  minimum mandatory that he faces.  Anything over that is greater

15  than necessary we argue on his behalf because of his

16  background, his family, all the things that we point to in

17  terms of the 3553(a) factors.

18       I think we also stated -- I guess we showed the

19  pictures and some of his family members are present here today.

20  The indication that the real Michael Benitez-Lopez already made

21  these mistakes, he got involved big in terms of mistakes with

22  these drugs and with Omar, but he is really a fairly -- not

23  fairly, he really is a nice young man who loves his son.  He

24  loves his fiancee.  He knows he is going to have to serve some

25  time.  He has taken courses to better himself while confined at

1   the Jefferson County Detention Facility.  And we brought all

2   that forward.  And the probation officer has kindly attached

3   that to the addendum and we attached those pictures of his

4   family.

5         And he will be involved seriously -- I was going to

6   say heavily, but seriously in an RDAP program for his alcohol

7   problem, which he clearly has and hopefully will emerge from

8   prison whenever, we hope after 10 years, with a -- as a new

9   young man.  He will be in his late thirties and he will have to

10  pick up the pieces and begin his life anew.

11        So for all those reasons and the reasons we've stated

12  in the motion, we pray that the Court see that a sentence of

13  120 months is sufficient, but not greater than necessary, for

14  Michael Benitez-Lopez.  And he would like to address the Court.

15        *THE COURT:*  Right.  I will allow him to do so after we

16  hear from the government, all right?

17        Ms. Podolak?

18        *MS. PODOLAK:*  So, Your Honor, let's talk about what

19  Mr. Chavez did not do.  He was the first one in the door and he

20  said, I am going to cooperate.  He did not say despite all of

21  this evidence and despite everybody telling me I am making a

22  mistake to proceed and go to trial.  He did not obstruct

23  justice.  His Criminal History Category is II, not IV.

24        There are significant differences in the behavior, but

25  the big thing is acceptance of responsibility, being able to

1    come in and say, yup, I did it, you caught me, okay, and take

2    responsibility for your action. That is not what

3    Mr. Benitez-Lopez apparently has ever done because if you look

4    at his history, all he does is continue to violate the rules of

5    various courts, reoffend and threaten people.

6         I am sort of shocked about the argument about, oh, he

7    has this wonderful family that's going to support him. This is

8    the same family that sat in the back and somebody called his

9    brother down in Mexico and his brother turned around and

10   threatened Omar Chavez's wife and Omar. That's the defendant's

11   family.

12        The defendant loves his wife. He loves his kid. The

13   Court may recall a telephone call that took place on the day

14   his son was born. He is in the hospital and Mr. Chavez says to

15   him, "Hey, you're a dad. How do you feel?" He is like, "Huh,

16   let's do a deal." That's really who he is. He is not this

17   loving productive member of society that the defense has

18   described him to be.

19        I was curious as to probation sort of coming up with

20   180 months almost out of nowhere that I could see. Why shave

21   seven years off? Just because. The guidelines say 262 to 327

22   based on Criminal History Category IV, based on obstruction of

23   justice. What's the reason under 3553(a) to go outside of the

24   guidelines? The government doesn't see it and would request

25   that the Court impose a sentence within the guideline range.

1          *THE COURT:*  Thank you, Ms. Podolak.

2          Mr. Stuckey, anything more from you?

3          *MR. STUCKEY:*  Just to state, Your Honor, before

4    Mr. Benitez-Lopez addresses the Court that this business of he

5    came in first, he did this, he did that and whatnot, well, as

6    we stated in our response to the Presentence Investigation

7    Report at Page 3, I think, we laid out the fact that the

8    government had earlier asserted in a Plea Agreement proposal

9    that the defendant's relevant conduct was 15 to 50 kilograms,

10   which would be another reason I think to indicate that a

11   sentence of 120 months is sufficient, but not greater than

12   necessary, even according to the government's thinking way back

13   when.

14         *THE COURT:*  All right.  Thank you, Mr. Stuckey.

15         Mr. Benitez-Lopez, would you like to address the

16   Court?

17         *THE DEFENDANT:*  Yes.

18         *THE COURT:*  Okay.  Go ahead.  If you would stand at

19   the podium.  Thank you.

20         *THE DEFENDANT:*  Your Honor, I would like to apologize

21   to the courts.  And while I can't change the past, I can only

22   move forward with this, so meanwhile I am incarcerated.  I am

23   just going to try to do the best that I can to better myself,

24   myself and my family.  I don't want my son to follow in the

25   same footsteps as me, but that's why this is it for me.  I'm

1   done.  It's never too late to change.

2          *THE COURT:*  Anything else, Mr. Benitez-Lopez?

3          *THE DEFENDANT:*  That will be it.  That's all I've got

4   to say.

5          *THE COURT:*  What was that?

6          *THE DEFENDANT:*  That's it for me.

7          *THE COURT:*  Oh, all right.  Thank you very much.  You

8   may have a seat.

9          *THE DEFENDANT:*  Thank you.

10         *THE COURT:*  The United States Sentencing Commission

11  guidelines have become advisory.  The Court, while not required

12  to sentence within the guidelines, has taken them into account

13  in determining an appropriate sentence.  The Court has also

14  taken into account the statutory factors which are set forth in

15  18, United States Code, Section 3553(a).

16         The Court has already ruled on the objections and also

17  the motion for a departure.  And the Court has already

18  indicated the fine range and the guideline imprisonment range.

19  I will mention that as to the supervised release range, as to

20  Count One, it's five years.  As to Count Eight, it's one year.

21  As to Count Ten, it's between four and five years.

22         Mr. Stuckey on behalf of Mr. Benitez-Lopez has filed a

23  motion for a variant sentence.  Mr. Stuckey believes that the

24  defendant should be sentenced at the bottom of the mandatory

25  minimum range, namely 10 years.  The Probation Department is

1   recommending a sentence of 180 months imprisonment, which would

2   be a 15-year sentence.  The United States believes that the

3   defendant should at least be sentenced to the bottom of the

4   guideline range, which is 262 months imprisonment.

5        When you look back at the criminal history that we

6   talked about a little bit earlier, there was a lot of force to

7   the government's argument in response to the motion for a

8   variant sentence that the defendant has been involved in drug

9   dealing since age 16 and just for whatever reason just doesn't

10  get the message.  For one thing, you would think that if you

11  keep getting caught being a drug dealer, it's not a good idea

12  to do it again.

13       And it's true that Mr. Benitez-Lopez really hasn't

14  seemed to learn anything from his past.  Instead, he just

15  continues to break the law and then, as we know from this case,

16  get involved in something much, much worse.  And he is doing it

17  at a pretty young age.

18       When you do stuff like that after you know better,

19  know better not because like the rest of -- like virtually

20  everyone else in society, you know that dealing cocaine is a

21  bad idea, especially if you have a son or if you have someone

22  who you, you know, you're involved with, because if you're

23  caught and convicted, you probably won't be around to be there

24  for them, that you would think that that's -- you know, almost

25  everyone realizes that's a bad idea.

1    Mr. Benitez-Lopez in addition has, you know, this
2 criminal history which amply demonstrates that drug dealing is
3 a bad idea because he has been caught for it, he has been
4 punished for it, and now here he is getting the big time as an
5 adult.  He just doesn't really seem to get it.

6    And Ms. Podolak is also right in terms of the
7 acceptance of responsibility aspect of it.  That's one thing
8 that for whatever reason, I don't quite understand.
9 Mr. Benitez-Lopez just doesn't want to take responsibility for
10 what he did.  You know, otherwise -- most people do and enter a
11 plea of guilty when you have that much evidence against him,
12 not that he doesn't have a right to a trial.  He's got a right
13 to a trial.  He went to trial and, you know, the jury
14 determined it.

15    But, you know, if you look over his criminal history
16 and the fact that he just doesn't seem to comply with very many
17 of the sentences that have been imposed, it demonstrates that
18 he just doesn't take the law very seriously, and he is doing so
19 to the detriment of his family and his child.

20    Mr. Stuckey brings up the government's proposed Plea
21 Agreement.  I think it was in the Talamantes case that had a
22 guideline range -- or sorry, it had a different calculation in
23 terms of what should be reasonably foreseeable to the
24 defendant.  I am not going to in any way give -- I don't give
25 much weight to that.

1           The bottom line is that in the course of plea

2   negotiations, the government might adopt a somewhat generous to

3   the defendant estimate of such a thing.  I would imagine that

4   the last thing that defendants would want is for the government

5   to think that they might be estopped by that type of thing and,

6   as a result, make sure that if anything they are maybe even a

7   little hard-lined on those calculations.  That doesn't

8   necessarily do defendants as a whole any good.  Moreover, I

9   base my ruling on the objection to the amount of narcotics

10  reasonably foreseeable to Mr. Benitez-Lopez on the facts of

11  this particular case, not on some type of statement in some

12  Plea Agreement in a case not in front of me.

13          The defendant, while not really demonstrating any

14  great promise or providing much grounds for optimism before he

15  got arrested in this case, at least he hasn't been sitting

16  around.  Those certificates that were attached to the

17  Presentence Investigation Report, they are good.  I mean,

18  Mr. Benitez-Lopez has an alcohol problem.  Maybe he has a

19  cocaine problem.  He needs to get his act together on those

20  things.

21          His alcohol problem has been causing him or at least

22  influencing him to make some bad judgment, so he has

23  demonstrated that he is starting to take some of those things

24  seriously, and that's a good thing for him.  It kind of goes

25  to -- really the issue in this case goes to what I talked about

1  in response to one of Mr. Stuckey's arguments, and that was how

2  much a discount do we give to Mr. Benitez-Lopez because in

3  addition to making a bunch of bad decisions about drug dealing

4  and so the forth, he also seems to have made some really

5  serious calculations about how he should handle this particular

6  case.

7          Ms. Podolak said, where does this number come from?

8  180 months is pulled out of the air.  I don't really

9  necessarily think it was pulled out of the air.  I may not have

10 had a basis in terms of, oh, well, we calculate the guidelines

11 as follows, but the question really boils down for a person of

12 Mr. Benitez-Lopez's age, for a person of Mr. Benitez-Lopez's

13 criminal history and the fact that he does have this drug

14 dealing at an early age and he just doesn't -- never gotten the

15 lesson, what sentence would be sufficient, but not greater than

16 necessary, for Mr. Benitez-Lopez.

17         I really, I honestly can't believe even though

18 Mr. Benitez-Lopez seems to be a committed drug dealer, I don't

19 think that a 262-month term of imprisonment is sufficient but

20 not greater than necessary.  In fact, I think that the

21 Probation Department got it exactly right.  I think 180 months

22 is an appropriate sentence for Mr. Benitez-Lopez.

23         When you look back at the sentences that have been

24 previously imposed on him, he had -- of course, they were

25 nothing like this.  And now he is reallying paying a huge

1    price, but Mr. Benitez-Lopez was -- you know, he brought it

2    down upon himself, not just because of some plea negotiation

3    decision, but simply because of the fact that he decided to get

4    involved in dealing large quantities of cocaine as an adult,

5    getting involved with Mr. Chavez-Gutierrez and not keeping --

6    not learning a lesson from his past.  And the price is a big

7    one.  It's a big one.  Fifteen years is a tremendously long

8    sentence.  But I do believe that that sentence is sufficient,

9    but not greater than necessary, to punish Mr. Benitez-Lopez.

10          Therefore, pursuant to the Sentencing Reform Act of

11   1984, it is the judgment of the Court that the defendant,

12   Michael Benitez-Lopez, is hereby committed to the custody of

13   the Bureau of Prisons to be imprisoned for a term of 180 months

14   as to Count One.  I can't remember the sentencing -- oh, yeah,

15   the sentencing range -- the sentencing range, I think -- what's

16   the maximum sentencing range for Count Eight?

17          PROBATION OFFICER:  Four years, Your Honor.

18          THE COURT:  So I will sentence the defendant to 48

19   months as to Count Eight.

20          And then Count Ten maximum is?

21          PROBATION OFFICER:  40.

22          THE COURT:  40, yeah, and 180 months as to Count Ten,

23   all such terms to be run concurrently to one another.

24          Upon release from imprisonment, Mr. Benitez-Lopez

25   shall be placed on supervised release for a term of five years

1   which shall consist of five years as to Count One, one year as

2   to Count Eight and five years as to Count Ten, all such terms

3   of supervised release to run concurrently to one another.

4           The defendant upon -- within 72 hours of release from

5   Mr. Benitez-Lopez's term of imprisonment, he shall report to

6   the probation office in the district to which he is released.

7           While on supervision, Mr. Benitez-Lopez must not

8   commit another federal, state or local crime.  He must not

9   unlawfully possess a controlled substance.  He must also

10  refrain from any unlawful use of a controlled substance.  And

11  he must submit to one drug test within 15 days of placement on

12  supervision and two periodic tests thereafter.

13          Mr. Benitez-Lopez must cooperate in the collection of

14  DNA as directed by the probation officer.  And he must comply

15  with the standard conditions that have been adopted by the

16  Court in General Order 2019-6.

17          The Court finds that the following special conditions

18  of supervision are determined to be reasonably related to the

19  factors that are enumerated in 18, United States Code, Section

20  3553(a) and 3583(d).  Further, based upon the nature and

21  circumstances of the offense and the history and

22  characteristics of Mr. Benitez-Lopez, the following conditions

23  do not constitute a greater deprivation of liberty than

24  reasonably necessary to accomplish the goals of sentencing:

25          Namely, No. 1, Mr. Benitez-Lopez must participate in

1  and successfully complete a program of testing and/or treatment

2  for substance abuse as approved by the probation officer until

3  such time as he is released from the program by the probation

4  officer.  He must abstain from the use of alcohol or other

5  intoxicants during the course of treatment, and he must pay the

6  cost of treatment as directed by the probation officer.

7          Second, he must participate in a cognitive behavioral

8  treatment program as directed by the probation officer until

9  such time as he is released from the program by the probation

10  officer.  He must pay the cost of treatment as directed by the

11  probation officer.

12          Third, given Mr. Benitez-Lopez's propensity to deal

13  narcotics, he must submit his person, property, house,

14  residence, vehicles, papers, computers, other electronic

15  communications or data storage devices or media or office to a

16  search conducted by a United States probation officer.  Failure

17  to submit to search may be grounds for revocation of release.

18          He must warn any other occupants the premises may be

19  subject to searches pursuant to this condition.  An officer may

20  conduct a search pursuant to this condition only when

21  reasonable suspicion exists that he has violated a condition of

22  supervision and that the areas to be searched contains evidence

23  of the violation.  Any search must be conducted at a reasonable

24  time and in a reasonable manner.

25          He must pay a special assessment of $100 per count,

1  namely $300 total, which is due and payable immediately.  The

2  Court finds that he does not have the ability to pay a fine, so

3  the Court will waive a fine in this case.

4          Finally, Mr. Benitez-Lopez is advised of his right to

5  appeal the conviction and sentence in this case.  If he desires

6  to appeal, a notice of appeal must be filed with the Clerk of

7  the Court within 14 days after entry of judgment or the right

8  to appeal will be lost.  If he is unable to afford an attorney

9  for an appeal, the Court will appoint one to represent him.

10 And if he so requests, the Clerk of the Court must immediately

11 prepare and file a notice of appeal on his behalf.

12         I will include as part of the judgment in this case a

13 recommendation that the defendant be incarcerated at a facility

14 that has the RDAP program.  I think that the RDAP program would

15 be a good program for Mr. Benitez-Lopez given the fact that he

16 has got a demonstrated alcohol problem.

17         Ms. Podolak, anything else on behalf of the United

18 States?

19         *MS. PODOLAK:*  No, Your Honor.  Thank you.

20         *THE COURT:*  Thank you.

21         Anything else on behalf of Mr. Benitez-Lopez,

22 Mr. Stuckey?

23         *MR. STUCKEY:*  No, Your Honor.

24         *THE COURT:*  Then Mr. Benitez-Lopez will be remanded to

25 the custody of the United States Marshals and the Court will be

1    in recess.  Thank you.

2         (Recess at 12:15 p.m.)

3                       REPORTER'S CERTIFICATE

4         I certify that the foregoing is a correct transcript from

5    the record of proceedings in the above-entitled matter.  Dated

6    at Denver, Colorado, this 14th day of January, 2020.

7

8                              S/Janet M. Coppock

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25